IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| BRAD POORMAN, JBP VENTURES, LLC, | ) ) ) |
| Plaintiffs, | ) ) ) Case No. 4:21-cv-00211-RK |
| v. | ) ) |
| TTG, INC., | ) ) ) |
| Defendant. | ) |

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Before the Court, is Defendant TTG, Inc.'s ("TTG" or "Defendant") motion for summary judgment (Doc. 26.) The motion is fully briefed. (Docs. 27, 33, 34, 38.) After careful consideration and for the reasons discussed below, the motion is **DENIED in part and GRANTED in part.** Specifically, summary judgment in favor of Defendant is denied as to Plaintiffs' Counts I and II, and is granted as to Counts III and IV.

### Background[1]

This case arises out of a contract relationship between JBP Ventures, LLC, which is a company in the business of sales, marketing, and business development, and TTG, which is a company in the business of manufacturing and selling finished goods.

Plaintiff Brad Poorman ("Poorman") (jointly with JBP Ventures, LLC, "Plaintiffs") has nearly 40 years of experience in the textile industry, including starting, owning, and operating three different companies in the textile industry. (Doc. 33, ¶ 1, 4.) Poorman commonly operates his businesses under names including ATAG and JBP Ventures. (*Id.* at ¶ 4.) JBP Ventures, LLC was formed in Colorado in 2013, and the formation expired in 2015. (*Id.* at ¶ 5.) Since then, Poorman has conducted business as a sole proprietorship. (*Id.*) JBP Ventures has always been owned and operated entirely by Poorman. (*Id.*) Prior to the formation of the contract that is the subject of this case, there was an agreement between ATAG USA, of which Poorman was the

---
[1] Except where otherwise noted, these facts are taken from the parties' statements of uncontroverted material facts. The Court has omitted facts properly controverted, facts asserted that are immaterial to the resolution of the pending motion, facts asserted that are not properly supported by admissible evidence, legal conclusions, and argument presented as an assertion of fact.

principal, and TTG that governed the relationship between Poorman and TTG until February of 2019. (*Id.* at ¶¶ 8-9.)

In February of 2019, TTG and "JBP Ventures, a Delaware LLC," (Doc. 27-2 at 1) entered into a Consulting and Representative Agreement (the "Agreement"). (Doc. 27, ¶ 5.) Subsequent and unrelated to the Agreement, Poorman started a Delaware entity called "JBP, LLC" in October of 2020. (Doc. 33, ¶ 7.)

The parties do not dispute that they entered the Agreement or that the terms are as reflected in Exhibit 2 attached to Defendant's summary judgment motion (Doc. 27-2) and excerpted in the briefing on this motion. The parties' dispute in this case centers on the proper interpretation of the Agreement, in particular as to when and/or how commissions were earned under the Agreement, and whether Poorman can properly assert any rights under the Agreement in his individual capacity.

The Agreement states it "is among: (i) TTG Inc. ("TTG"), (ii) JBP Ventures, a Delaware LLC ("JBP LLC") and (iii) solely for purposes of Section 9.6 [(terminating the prior agreement between TTG and ATAG USA)], ATAG USA, a Delaware corporation ("ATAG USA")." (Doc. 27-2 at 1.) Article 1 of the Agreement sets forth definitions, providing:

> 1.1 **"Customer"** shall mean any manufacturer or company that purchases Apparel Products from TTG in the Territory.
>
> 1.2 **"Apparel Products"** shall mean any and all N-Aire treated laminates and treated films for Apparel, any and all Consumer and Protective Apparel, and designated apparel ePTFE Films as identified and prioritized from time to time in writing by TTG and / or added to this Agreement by an addendum signed by both Parties. The initial Apparel Products hereunder are identified in the attached Schedule "A."
>
> 1.3 **"Territory"** shall mean North America and Korea unless otherwise agreed to in writing by TTG and added to this Agreement by an addendum signed by both Parties for a specific new Apparel Product.
>
> . . . .
>
> 1.5 **"Net Selling Price"** shall mean money or any other consideration, exclusive of sales taxes, custom duties, value added taxes, transportation and insurance, if any, and net of any returns and allowances, collected by TTG in connection with the sale or other disposition of Products. **All pricing for films and new innovations will be predetermined by TTG. JBP LLC will get paid for each region a 5% commission for Products sold at full price. Any deductions or discounts will result in a commensurate reduction in commission.**
>
> 1.6 **"Party"** shall mean JBP LLC or TTG.

2

1.7 **"Parties"** shall mean JBP LLC and TTG.

(*Id.* (emphasis in original).)

Article 2 of the Agreement, in relevant part, gives JBP LLC only the right "to represent TTG as an agent with respect to the solicitation of orders for the sale of N-aire ® and certain agreed upon ePTFE films solely for Apparel to Customers in the Territory," and establishes that JBP LLC "shall be deemed an independent contractor" and "[i]n no event shall JBP LLC or its agents be deemed employees of TTG." (*Id.* at 2.)

Article 3, "Sales to Customers," provides, *inter alia*:

> 3.2 **Fulfillment.** Following receipt and acceptance by TTG of a written order for Apparel Products from a Customer within the Territory, TTG shall ship the ordered Apparel Products to such Customer. No order shall be deemed binding on TTG until accepted by TTG, and TTG reserves the right to reject any order or to cancel the same or any part of it after acceptance, for credit or any other reason whatsoever deemed by TTG to be sufficient. TTG shall use commercially reasonable efforts to inform JBP LLC of the status of the fulfillment of all orders processed through JBP LLC.

(*Id.*)

Article 4 is titled "Business Procedures" and provides, in relevant part:

> 4.1 **Commissions.** TTG shall pay to JBP LLC a commission of five percent (5%) of the Net Selling Price of Apparel Products placed by JBP LLC to Customers in the Territory or to third party manufacturers for sale into the Territory. JBP LLC's commissions shall be payable by means mutually agreed to by the Parties the fifteenth (15th) day of the month following which TTG receives payment by each Customer. If payment received by TTG is for less than the full amount of that billed, TTG shall prorate JBP LLC's commission on that amount actually received by TTG.

(*Id.* at 3.)

Article 6, "Term and Termination," provides, in relevant part:

> 6.1 **Dissolution.** Notwithstanding the rights granted to JBP LLC under this Agreement, TTG[] may terminate this Agreement for no cause on ninety (90) days' written notice to JBP LLC. If this Agreement is terminated under the provisions of this Section 6.1, then (i) TTG shall pay to JBP LLC those payments as provided in Section 6.4 herein.
>
> . . . .
>
> 6.4 **Commissions Payable.** In the event of the expiration or termination of this Agreement pursuant to Sections 6.1 and 6.2, TTG shall pay to JBP LLC in accordance with the terms of this Agreement, (i) all unpaid commissions earned by

3

JBP LLC as of the termination date, and (ii) all commissions for N-aire / ePTFE for existing customers over the 6 months following termination.

(*Id.* at 4.)

Tim Nestor, the CEO of TTG, testified in deposition that TTG's normal process as to the purchase and production of goods was that it would prepare a quote for a customer; the customer would accept the quotation; the customer would provide a purchase order that would include the product, the requested delivery date, and any product specifications; TTG would then accept the order, produce the order, ship the order, invoice the order, and then collect payment on the order. (Doc. 27 at ¶ 17.)

On or about October 21, 2019, TTG notified JBP LLC, by letter to Brad Poorman, JBP LLC, of the termination of the Agreement effective January 21, 2020. Thus, the six-month runout period provided for in Section 6.4 of the Agreement would end on July 21, 2020. (*Id.* at ¶ 23; Doc. 33-15.) TTG has paid $8,240.78 in commissions. (Doc. 27 at ¶ 25.) TTG claims it has paid all commissions due pursuant to the Agreement in full (Doc. 26 at 1), while Plaintiffs claim they are owed commissions on millions of dollars in revenue secured by TTG through their services (Doc. 34 at 38).

Plaintiffs filed this action alleging claims for violations of the Missouri Commission Sales Act, § 407.913, RSMo, (Count I); breach of contract (Count II); quantum meruit (Count III); and unjust enrichment (Count IV). (Doc. 1.) TTG now moves for summary judgment as to each of Plaintiffs' claims. (Doc. 26.)

## Legal Standard

"Summary judgment is required if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (quotation marks and citations omitted). In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the nonmoving party and giv[es] the nonmoving party the benefit of all reasonable inferences." *Id.* (quotation mark and citation omitted). At the summary judgment stage, the movant must "support" its motion either by "citing to particular parts of materials in the record" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); Fed. R. Civ. P. 56(c)(1). The nonmovant must then "present affirmative evidence in order

4

to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

## Discussion

I. **Individual Claims of Plaintiff Brad Poorman**

TTG first asserts it is entitled to summary judgment as to each of Poorman's individual claims because the only relationship that is the source of the causes of action as alleged in the Complaint was that between TTG and JBP, established in the Agreement. Plaintiffs argue in response that Poorman is a proper party plaintiff because he operates JBP as a sole proprietor and under Missouri law, a person may make a contract under a fictitious name and recover in his individual capacity under that assumed company or fictitious name for services rendered pursuant to that contract, if such contract is not prohibited by law.

The parties agree Missouri law applies, and Section 9.4 of the Agreement indicates that it is governed by and to be construed and enforced in accordance with the laws of the State of Missouri without regard to the conflicts of laws principles of such State. Further, pursuant to Federal Rule of Civil Procedure 17(a): "[e]very action shall be prosecuted in the name of the real party in interest." "The real party in interest is a party who, under governing substantive law, possesses the rights to be enforced." *Consul Gen. of Republic of Indonesia v. Bill's Rentals, Inc.*, 330 F.3d 1041, 1045 (8th Cir. 2003). "In a diversity action, state law determines the issue of who is a real party in interest." *Id.* (internal quotation omitted).

"Under Missouri law, sole proprietorships have no independent existence. '[A] sole proprietorship has a single owner and is characterized by the complete identity of the business entity with the individual doing business.'" *Bigfoot on the Strip, LLC v. Winchester*, No. 18-3155-CV-S-BP, 2018 WL 3676962, at *2 (W.D. Mo. Aug. 2, 2018) (quoting *Morgan Wightman Supply Co. v. Smith*, 764 S.W.2d 485, 492 (Mo. Ct. App. 1989) and citing *Bethel v. Sunlight Janitor Serv.*, 551 S.W.2d 616, 621 (Mo. 1977) (en banc)). Here, JBP Ventures, LLC was operated as a sole proprietorship by Poorman at all times relevant to the Agreement. JBP Ventures has always been owned and operated entirely by Poorman. As such, "JBP Ventures, LLC" has no independent existence separate and apart from Poorman; and Poorman can sue on the Agreement because "JBP Ventures, LLC" is not an independent entity. *See Winchester*, 2018 WL 3676962, at *2.

5

Because the Court finds Defendant has not shown as a matter of law that Poorman cannot sue in his individual name for causes of action arising under the Agreement, Defendant's motion for summary judgment on all claims brought by Poorman in his individual name is denied.

II.     **Breach of Contract – Count II**[2]

As to Plaintiffs' breach of contract claim in Count II, TTG contends it is entitled to judgment as a matter of law because the contract between the parties is only subject to one reasonable interpretation, under which all commissions due pursuant to the contract have been paid. Plaintiffs' position, in contrast, is that TTG has not paid some commissions earned under the terms of the Agreement.

Under Missouri law, contract interpretation is a question of law. *See generally State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 44 (Mo. banc. 2017) (abrogated on other grounds by *Theroff v. Dollar Tree Stores, Inc.*, No. SC 97235, 2020 WL 203121 (Mo. banc. 2020)). Determining whether a contract is ambiguous is also a question of law for the court. *Parker v. Pulitzer Pub. Co.*, 882 S.W.2d 245, 249 (Mo. App. 1994); *Busch & Latta Painting Corp. v. State Hwy. Comm'n*, 597 S.W.2d 189, 197 (Mo. App. 1980). "The fact the parties disagree over the interpretation of a contract or a provision does not mean the contract is ambiguous." *Parker*, 882 S.W.2d at 249. An ambiguity only exists "when there is more than one *reasonable* interpretation which can be gleaned from the contract language." *Id.* (emphasis in original). "Accordingly, when a contract provision is susceptible to two interpretations, only one of which is reasonable, the reasonable interpretation should be given effect." *Id.* Where an unambiguous term is not defined in the contract, it is given this "its plain and ordinary meaning—often referring to a dictionary and carefully considering the context of the contract to select the appropriate definition." *TCN Invs., LLC v. Superior Detail*, 588 S.W.3d 245, 251 (Mo. Ct. App. 2019). Missouri contract law also provides that "each term of a contract is construed to avoid rendering other terms meaningless" and "[a] construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. banc 2003).

Here, viewing the Agreement as a whole, the Court finds there is only one reasonable interpretation of the commissions provisions. Section 4.1 unambiguously provides that

---

[2] The Court addresses Defendant's arguments in the order set forth in its suggestions in support, hence, Plaintiff's Counts I and II are analyzed in reverse order.

commission of five percent is earned when Apparel Products are "placed by JBP LLC to Customers in the Territory or to third party manufacturers for sale into the Territory." Giving the word "placed" its plain and ordinary meaning, Merriam-Webster's Disctionary lists among other definitions, "to give (an order) to a supplier" and "to give an order for." *Place*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/place (last visited April 7, 2022). As a result, the reference to "placed" in the first sentence of Section 4.1 means the Agreement mandates TTG to pay commission of five percent of the Net Selling Price of Apparel Products for which JBP LLC gave an order from a customer to TTG, the supplier.

This interpretation finds further support in the language of Section 6.4, which controls the commissions payable following termination of the Agreement. This section dictates TTG shall pay JBP LLC commissions "earned by JBP LLC as of the termination date" and "commissions for N-aire / ePTFE for existing customers over the 6 months following termination." This language, like that in Section 4.1, (1) contemplates that commissions can be earned by JBP prior to TTG's payment of the earned commissions to JBP LLC, and (2) is in harmony with the undisputed provision that JBP LLC's role under the Agreement is that of an agent representing TTG for solicitation of orders and sale of its products (Doc. 27 at 1), thereby earning commission (not, for example, by delivering the final products and collecting payment on invoices).

In so ruling, the Court rejects Defendant's argument that this interpretation "totally ignores the definition of 'Net Selling Price' in the Agreement." (Doc. 27 at 12.) The dollar amount of commission earned and ultimately paid plainly depends upon this definition. This definition does not, however, change the manner and timing of when a commission is earned pursuant to Section 4.1; rather, it provides only for determination of the amount earned (or payable) in commission. For example, when an order is placed by a customer through JBP LLC's efforts (thereby earning JBP LLC a 5% commission), and TTG ultimately collects less than or none of what the initially placed order reflected, JBP LLC's commission payment amount will be controlled by the definition in 1.5 of Net Selling Price, thereby reducing the dollar amount paid to fulfill JBP LLC's commission earned. Likewise, an order could be placed by a customer through JBP LLC's efforts (thereby earning JBP LLC a 5% commission), and TTG could collect full price for the Products sold under the order, and there would be no reduction in the dollar amount paid on the commission. Even in the event of a dissolution under Section 6.1, JBP would still be entitled to a 5% commission for orders that had been placed before dissolution but where payment has not yet been made by

the customer. Said another way, once TTG receives payment from the customer for the product, TTG is obligated to pay JBP a 5% commission even if the agreement has been dissolved and JBP is no longer representing TTG as an agent. Nonetheless, in this situation, the Agreement dictates that JBP LLC is owed earned commission pursuant to Section 6.4 for the six months following the termination although the Agreement has terminated. Under this circumstance, too, the definition in 1.5 of Net Selling Price will apply to determine the dollar amount paid to fulfill JBP LLC's commission earned.

The Court additionally rejects Defendant's contention that "placement of an order by a customer would only occur at such time as an actual order was received, manufactured, shipped, invoiced and paid by a customer." (Doc. 38 at ¶ 28.) This interpretation contravenes the plain and ordinary meaning of the word "placed," does not harmonize with the other provisions of the Agreement, and is not reasonable. Further, the Agreement is not ambiguous on the ground that the provisions of the Agreement are arguably susceptible to Defendant's proffered interpretation, which the Court finds is not reasonable; rather, the reasonable interpretation should be given effect. *Parker*, 882 S.W.2d at 249.

The Court finds the Agreement is unambiguous as to when and how commissions were earned by JBP LLC. Because Defendant's argument that it is entitled to summary judgment on Plaintiffs' breach of contract claim relies on its erroneous interpretation of the Agreement as to the earning of commissions, summary judgment in favor of Defendant on Plaintiffs' Count II is denied.

**III.    Violations of the Missouri Commission Sales Act – Count I**

TTG argues it is entitled to summary judgment as to Count I, Plaintiffs' claim for violations of the Missouri Commission Sales Act ("MCSA"). The MCSA, Mo. Rev. Stat. §§ 407.911, *et seq.*, "governs the obligation for and payment of sales commissions in the State of Missouri, 'focus[ing] on the timely payment of sales commissions earned by a sales representative under contract with a principal.'" *Freeman v. MH Equip. Co.*, No. 4:15CV1473 CDP, 2016 WL 1732769, at *1 (E.D. Mo. May 2, 2016) (quoting *Lapponese v. Carts of Colo., Inc.*, 422 S.W.3d 396, 401 (Mo. Ct. App. 2013)). The MSCA provides as follows, detailing when commissions become due:

1. When a commission becomes due shall be determined in the following manner:

(1) The written terms of the contract between the principal and sales representative shall control;

(2) If there is no written contract, or if the terms of the written contract do not provide when the commission becomes due, or the terms are ambiguous or unclear, the commission shall be paid when the product or service is delivered and accepted by the purchaser or the principal receives satisfaction in full;

(3) If neither subdivision (1) nor (2) of this subsection can be used to clearly ascertain when the commission becomes due, then the commission shall be due on the date the principal accepts the order and receives satisfaction in full, unless the custom and usage prevalent in this state for the parties' particular industry is different, in which event such custom and usage shall prevail.

2. Nothing in sections 407.911 to 407.915 shall be construed to impair a sales representative from collecting commissions on products or services ordered prior to the termination of the contract between the principal and the sales representative but delivered and accepted by the purchaser after such termination.

3. When the contract between a sales representative and a principal is terminated, all commissions then due shall be paid within thirty days of such termination. Any and all commissions which become due after the date of such termination shall be paid within thirty days of becoming due.

Mo. Rev. Stat. § 407.912. Section 407.913 provides for liability of a principal to a sales representative for commissions earned where the principal does not timely pay:

Any principal who fails to timely pay the sales representative commissions earned by such sales representative shall be liable to the sales representative in a civil action for the actual damages sustained by the sales representative and an additional amount as if the sales representative were still earning commissions calculated on an annualized pro rata basis from the date of termination to the date of payment.

"§ 407.913 applies to *any* termination of the sales representative-principal relationship and not just involuntary terminations[.]" *Freeman*, 2016 WL 1732769, at *3 (citing *Lapponese*, 422 S.W.3d 396).

Here, TTG's argument that it is entitled to summary judgment on Plaintiffs' MCSA claim relies on the same flawed argument TTG advanced as to Count II regarding the interpretation of the Agreement as to when and how commissions are earned. Accordingly, Defendant has not shown it is entitled to judgment as a matter of law on Plaintiff's Count I, and the Court denies summary judgment on this claim.

## IV. Quantum Meruit and Unjust Enrichment – Counts III and IV

Finally, TTG argues it is entitled to judgment as a matter of law on Plaintiffs' claims for Quantum Meruit (Count III) and Unjust Enrichment (Count IV) because the existence of the

9

Case 4:21-cv-00211-RK   Document 45   Filed 05/03/22   Page 9 of 11

express written agreement precludes claims for equitable relief. In response, Plaintiffs contend Defendant does not address the merits of their equitable claims, and they should be able to move forward on these alternative theories to trial along with their theories based on the Agreement. To the extent Plaintiffs acknowledge double recovery is not allowed, they assert election among their alternatively pleaded theories of recovery is not Defendant's prerogative and is not required at this point in the litigation.

To succeed on a quantum meruit cause of action, a plaintiff must prove the following elements:

> [1] [T]he plaintiff provided to the defendant materials or services at the defendant's request or with the acquiescence of the defendant, [2] that the materials or services had reasonable value, and [3] that the defendant, despite the demands of the plaintiff, has failed and refused to pay the reasonable value of such materials or services.

*Cty. Asphalt Paving, Co., Inc. v. Mosley Constr., Inc.*, 239 S.W.3d 704, 710 (Mo. App. 2007) (quotation omitted). "The principal function of this type of implied contract is the prevention of unjust enrichment, and a claim for quantum meruit does not require the existence of an express agreement between the parties." *Id.* (quotation omitted). Similarly, "unjust enrichment . . . occurs 'where a benefit is conferred upon a person in circumstances in which retention by him of that benefit without paying its reasonable value would be unjust.'" *Am. Civil Liberties Union/E. Mo. Fund v. Miller*, 803 S.W.2d 592, 595 (Mo. banc 1991) (quoting *Erslon v. Vee-Jay Cement Contracting Co.*, 728 S.W.2d 711, 713 (Mo. Ct. App. 1987)).

However, "Missouri law does not permit recovery in quantum meruit or unjust enrichment when the plaintiff's relationship with the defendant is governed by an existing contract." *32nd St. Surgery Ctr., LLC v. Right Choice Managed Care*, 820 F.3d 950, 957 (8th Cir. 2016) (citation and quotation omitted). In other words, "'[i]f the plaintiff has entered into an express contract for the very subject matter for which he seeks recovery, unjust enrichment does not apply, for the plaintiff's rights are limited to the express terms of the contract.'" *R & R Land Dev., L.L.C. v. Am. Freightways, Inc.*, 389 S.W.3d 234, 243 (Mo. Ct. App. 2012) (quoting *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. Ct. App. 2010)).

Here, as discussed above, the Agreement – the existence of which the parties do not dispute – governs the parties' dispute over whether earned but yet unpaid commissions are now owed by Defendant to Plaintiffs. Plaintiffs' equitable claims seek damages for unpaid "commissions they

10

Case 4:21-cv-00211-RK   Document 45   Filed 05/03/22   Page 10 of 11

were promised and due" (Doc. 1 at ¶¶ 45, 49) and their "due and payable" "unpaid commissions" (*id.* at ¶¶ 52, 54). Thus, Plaintiffs' equitable claims for the quasi-contract remedies of quantum meriut and unjust enrichment are barred as a matter of law because an express contract undisputedly exists for the very subject matter for which Plaintiffs seek recovery in asserting those equitable claims.

Plaintiffs' cited authority is distinguishable. For example, in *Joseph F. Wagner, Jr. Revocable Tr. U/A v. Thomson*, the court found submission of both plaintiff's contract claim and unjust enrichment claim to the jury was proper under the circumstances as they were not inconsistent in the context of that case; but the court also acknowledged, "[h]ad there been a stipulation, or no dispute, as to the existence of a contract, we agree that the unjust enrichment instruction would have been superfluous." 586 S.W.3d 273, 280 (Mo. Ct. App. 2019). Specifically, in *Wagner*, the appellate court reasoned: "Appellants disputed the existence of a contract and the evidence allowed for the jury to agree with Appellants on that issue but still find Appellants unjustly enriched at Respondent Trust's expense," and therefore "it was not improper to submit both breach of contract and unjust enrichment claims to the jury. Both issues were pled and, given the evidence, proper for consideration." *Id.* Here, in contrast, the parties do not dispute the existence of the Agreement, thus rendering Plaintiffs' equitable claims superfluous.

Defendant is therefore entitled to judgment as a matter of law on Plaintiffs' quantum meriut and unjust enrichment claims. Accordingly, summary judgment is granted in favor of Defendant as to Counts III and IV of Plaintiff's complaint.

## Conclusion

Accordingly, and after careful consideration, Defendant's motion for summary judgment (Doc. 26) is **DENIED in part and GRANTED in part** as follows:

(1) Summary judgment in favor of Defendant is **DENIED** as to Counts I and II; and

(2) Summary judgment in favor of Defendant is **GRANTED** as to Counts III and IV.

**IT IS SO ORDERED.**

/s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: May 3, 2022